CHANDLER, Justice,
for the Court:
¶ 1. In this attorney-discipline case, we affirm the Mississippi Bar Complaint Tribunal’s finding that attorney Joe Pegram violated Mississippi Rule of Professional Conduct 1.1 (Competence). We additionally find that Pegram violated Rule 1.16 (Declining or Terminating Representation). We affirm the Public Reprimand issued by the Complaint Tribunal and additionally order this matter referred to the Fee Dispute Resolution Committee of the Mississippi Bar for a determination as to whether Pegram should refund as unearned a portion of the flat fee he accepted to complete his client’s case.
FACTS AND PROCEEDINGS BELOW
¶ 2. In 2005, Oxford attorney Joe Pe-gram agreed to corepresent Iroko Ayodele on a charge of felony possession of marijuana. When initially approached by a friend of Iroko’s father about the possibility of representing Iroko, Pegram stated that he did not handle criminal matters, but would make an effort to help find a criminal attorney who would be available to accept the representation. Pegram contacted Oxford lawyer Jay Carmean, who routinely handled criminal cases. Carme-an stated that he generally charged be *232 tween $15,000 and $20,000 to handle a case like Iroko’s, with $10,000 due preindictment, with the balance to be paid post-indictment. Iroko’s father mortgaged his home in order to raise the $20,000 fee. He had the check sent to Pegram, who deposited it into his lawyer trust account.
¶ 3. Pegram and Carmean decided that Pegram would also participate in representation due to his familiarity with the arresting officer. They determined that Carmean would be paid $6,000 for his part in the preindictment work and Pegram $4,000. Carmean entered into a contract to represent Iroko through indictment. Carmean and others testified at the Mississippi Bar Complaint Tribunal hearing that $20,000 is a reasonable fee to charge in that locality for a case like Iroko’s.
¶ 4. Carmean and Pegram met with the arresting officer and an assistant district attorney about the possibility of a plea agreement. Iroko subsequently rejected a plea bargain for a seven-year prison sentence. Carmean believed, as a result of that meeting, that law enforcement officials had additional charges they intended to bring, likely involving audio and video tapes of more serious crimes. In June 2005, Iroko was indicted for seven counts of possession of marijuana and narcotics with intent to sell. Post-indictment, and in light of Carmean’s understanding that no more money was available to pay him for representation, Carmean formally withdrew as counsel and Pegram was formally substituted as counsel for Iroko.
¶ 5. Around this time, Pegram began to investigate the possibility of getting Iroko into a pretrial diversion program as a way of avoiding jail time. A local judge, Judge Henry Lackey, informed him of this program and directed him to contact district attorney Ben Creekmore for more information. From 2005 to 2009, Pegram called and wrote several letters to Creek-more inquiring about Iroko’s eligibility for pretrial diversion. Other than an initial communication in which Creekmore indicated that Iroko needed to be drug-free before pursuing pretrial diversion, Creek-more did not respond to Pegram’s letters. Iroko’s case was continued multiple times over this period.
¶ 6. During those four years, Pegram arranged for Iroko to be drug-tested for marijuana three times with the view of making him eligible for pretrial diversion. He also helped Iroko obtain a job and purchased a car for Iroko for $2,100. Iro-ko returned the car as soon as he earned enough money to purchase one for himself. The money for the car came from Pe-gram’s operating account. He paid Iroko significantly above minimum wage to perform handyman tasks around his house. He also assisted Iroko in obtaining dismissals or expungements of various justice-court charges.
' ¶ 7. In January of 2009, a new assistant district attorney, Tom Levidiotis, who had been hired in part to help address a large backlog of cases, called Iroko’s case to trial on short notice. On the day of trial, January 6, 2009, Pegram called Iroko to his office. From there, he took him to court. Then, without any forewarning to Iroko, Pegram made a verbal motion to withdraw as counsel, saying
I will be glad to refile my verbal motion to withdraw as attorney of record because I have never tried a criminal case. I have only been in this one for negotiation purposes. Which I had hoped would work out with a pretrial diversion and I understand the District Attorney can reduce the charges of sale to possession which would allow that but apparently they didn’t want to go that route at this time. So I filed a motion to withdraw so Mr. Ayodele can have a competent criminal attorney which is not me.
*233 The State objected to the motion to withdraw, pointing out that Pegram had been involved with the case for four years, had not in fact negotiated a settlement or done anything substantive while the case was continued, and that permitting such withdrawals impeded the orderly handling of the docket. The court noted agreement, saying
... if you are going to enter an appearance on behalf of a defendant you should be prepared to take the case to trial. That is factual, axiomatic, no exception rule. However, ... ultimately the fairness of the proceedings is what matters and the protecting the rights of the defendant is paramount in that process and in order to ensure that that is done ... I’m going to relieve Mr. Pegram and grant his oral motion to withdraw.
¶ 8. Then Iroko’s father informed the court that he did not have the funds to hire another attorney, as he was still paying off the loan from hiring Pegram. The court called a local attorney with an office close to the courthouse and appointed him to come immediately represent Iroko. That same day, Iroko entered into a plea deal in which the charges were reduced to possession and he was sentenced to serve three years.
¶ 9. Iroko filed an informal bar complaint against Pegram, complaining that Pegram had abandoned him the day of trial after accepting a large fee from his father. At the direction of the Committee on Professional Responsibility, the Mississippi Bar filed a formal complaint against Pegram on June 8, 2012. A trial was held before a Complaint Tribunal on November 2, 2011.
¶ 10. Pegram was unable to provide an accounting of the expenditure of the remainder of the $20,000 fee post-indictment. He stated that he considered himself to have been using Iroko’s father’s money— money from the flat fee — when he bought Iroko the car and paid him for handyman labor. He stated that his trust-fund records had been destroyed inadvertently several years before when his daughters cleaned out his office. The Complaint Tribunal hearing transcript reflects the following discussion regarding the amount of the flat fee available in the trust account at the time of indictment and Pegram’s understanding of his own role going forward:
[BAR] So there should have been some more money available?
[PEGRAM] Well, it was.
[BAR] Okay. Did you advise Jay [Car-mean] you still had money in your trust account?
[PEGRAM] Well, I’m sure — now why should I advise him of that. He knew I got a check, and so I didn’t advise him of that, no.
[BAR] Okay. Did you ever offer to give him more money out of your trust account?
[PEGRAM] No. As I understood my conversations with Jay, he needed another 10, and I thought maybe after I talked with Judge Lackey I could get the pretrial diversion for Iroko and be done with the case. I didn’t need Jay to help me on that part.
[BAR] Okay. So at that time you had decided that you could handle the case?
[PEGRAM] Well, I wouldn’t say handle the case, no. I thought I could maybe talk with Ben Creekmore and get pretrial diversion for Iroko. As far as handling the case if he went to trial, I knew I couldn’t do that.
[BAR] How much of the $20,000 fee had you earned in July of '05?
[PEGRAM] That’s six years ago. I have no idea. Well, let me tell you how these criminal lawyers do. They *234 don’t keep time records. They charge an “x” — we’ll do your case for 20,-000... I know of a case ... where a guy paid [the attorney] $25,000, he went down there and pled him guilty, kept the money, and didn’t keep any time. So criminal records or criminal attorneys apparently don’t keep any time records, like you do if you’re representing an insurance company.
(Emphasis added.)
¶ 11. The Complaint Tribunal found a lone violation of Mississippi Rule of Professional Conduct 1.1 (Competence) and issued a public reprimand. The Bar appeals, asking this Court to find additional violations and imposing a sanction of at least six month’s suspension from the practice of law.
DISCUSSION
¶ 12. This Court has exclusive and inherent jurisdiction over attorney-discipline matters. Miss. Bar v. Alexander, 669 So.2d 40, 41 (Miss.1996); Asher v. Miss. Bar, 661 So.2d 722, 727 (Miss.1995); Rule 1(a), Rules of Discipline for the Mississippi State Bar. On appeal from the findings of the Complaint Tribunal, we “shall review the entire record and the findings and conclusions of the Tribunal, and shall render such orders as the Court may find appropriate.” Foote v. Miss. State Bar Ass’n, 517 So.2d 561, 564 (Miss.1987); M.R.D. 9.4. When reviewing disciplinary matters, this Court “reviews the evidence de novo, on a case-by-case basis, sitting as trier of fact, and no substantial evidence or manifest error rule shields the Tribunal from scrutiny.” Foote, 517 So.2d at 564 (citing Hoffman v. Miss. State Bar Ass’n, 508 So.2d 1120, 1124 (Miss.1987)); Vining v. Miss. State Bar Ass’n, 508 So.2d 1047, 1049 (Miss.1987). Rule 8.6 of the Mississippi Rules of Discipline provides that “[n]o discipline shall be imposed except upon clear and convincing evidence.”
I. Violations of the Mississippi Rules of Professional Conduct
A. Violation of Rule 1.1 (Competence)
¶ 13. We agree with the Complaint Tribunal’s finding that Pegram violated Rule 1.1 of the Mississippi Rules of Professional Conduct. Rule 1.1 provides:
A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.
M.R.P.C. 1.1.
The Complaint Tribunal found:
Rule 1.1, MRPC, provides that a lawyer shall provide competent representation to a client. Mr. Pegram admitted he is not competent to try a criminal case. The Complaint Tribunal notes that Mr. Pegram had initially intended to have another lawyer handle the case; however, when he determined that he could negotiate a pre-trial diversion deal for Iroko, Mr. Pegram became Iroko’s attorney for all purposes, including trial, regardless of his subjective intent.... Lawyers need to be on notice that, notwithstanding the extent of work they might have done in the representation of a client, and here there is evidence that Mr. Pegram did perform substantial work on Iroko’s case, they likewise accept a responsibility to ensure that the task is completed reasonably.[1]
*235 ¶ 14. Inexperience in a practice area certainly does not preclude representation where an attorney takes the necessary steps to educate himself or herself on competent representation or associates competent counsel. The comments to Rule 1.1 state in part:
A lawyer need not necessarily have special training or prior experience to handle legal problems of a type with which the lawyer is unfamiliar.... A lawyer can provide adequate representation in a wholly novel field through necessary study. Competent representation can also be provided through the association of a lawyer of established competence in the field in question.
M.R.P.C. 1.1 cmt.
While Pegram initially took the appropriate approach by associating a criminal attorney, he should not subsequently have taken on sole representation of Iroko while also expecting his role to be limited to negotiating a pretrial diversion. He admitted that, post-indictment, “[a]s far as handling the case if he went to trial, I knew I couldn’t do that.” The record is unambiguous that the $20,000 flat fee was quoted and was intended to include representation at trial.
¶ 15. Pegram argues that his withdrawal was a strategic choice to protect his client’s interest, and that his client greatly benefitted by his withdrawal, as evidenced by the lenient plea deal Iroko’s newly appointed counsel immediately reached with the State. But the ultimate plea Iroko reached was not the result of Pegram’s competent representation, and it does not excuse Pegram from placing Iroko in the position of having his sole attorney unprepared to try the case four years into representation.
B. Violation of Rule 1.16 (Declining or Terminating Representation)
¶ 16. We find that Pegram violated Rule 1.16 by accepting the $20,000 fee to provide Iroko representation through the trial, undertaking representation, and then abandoning his client without providing him counsel or reasonable notice, and without returning any unearned portion of the flat fee. The comment to Rule 1.16 states:
A lawyer should not accept representation in a matter unless it can be performed competently, promptly, without improper conflict of interest and to completion. Representation in a matter is completed when the agreed-upon assistance has been concluded.
M.R.P.C. 1.16 cmt. (emphasis added). Rule 1.16(d) states:
Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client’s interest, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment that has not been earned....
M.R.P.C. 1.16(d) (emphasis added).
¶ 17. A flat fee “embraces all work to be done, whether it be relatively simple and of short duration, or complex and pro *236 tracted.” ABA Comm, on Ethics and Professional Responsibility, Informal Op. 1389 (1977) (see also Iowa Supreme Court Bd. of Prof'l Ethics & Conduct v. Apland, 577 N.W.2d 50, 56 (Iowa 1998)). In a criminal case, “all work to be done” includes the work of trying the case if it goes to trial. Withdrawal from a case before completion of the representation is permitted so long as the withdrawal is in compliance with Rule 1.16. Compliance with this rule includes the return of any unearned fees. See Goeldner v. Miss. Bar, 891 So.2d 130 (Miss.2004).
¶ 18. In the context of a flat fee, the unearned portion of the fee should be calculated using the reasonableness factors of Rule 1.5(a), and, given that clients are provided up front with the expectation that the flat fee is a reasonable calculation of all of the work to be done, special consideration should be given to how close to completion the attorney has brought the legal matter, not merely the amount of time and effort the attorney has invested at date of the’termination of representation. See In re Reinstatement of Kelly, 987 So.2d 925 (Miss.2008).
II. SANCTIONS
¶ 19. In attorney-discipline cases, we evaluate what sanctions are appropriate based on the following factors:
(1) The nature of the misconduct involved; (2) the need to deter similar misconduct; (3) the preservation of dignity and reputation of the legal profession; (4) the protection of the public; (5) sanctions imposed in similar cases; (6) the duty violated; (7) the lawyer’s mental state; (8) the actual or potential injury resulting from the misconduct; and (9) the existence of aggravating or mitigating factors.
See Liebling v. Miss. Bar, 929 So.2d 911, 918 (Miss.2006). The primary nature of the misconduct involved is. incompetence. From the outset, Pegram was aware of his incompetence to try a criminal case and yet elected to continue sole representation of his client, placing his client in the position of lacking a competent lawyer to try his case. Pegram’s incompetence led to his failure to comprehend the seriousness of the charges his client was facing and the strong potential of the case going to trial.
¶ 20. Attorneys must be deterred from accepting cases (and the accompanying fees) when they have no intention of being responsible for the case to completion and from failing to terminate representation in compliance with the rules of professional conduct. Such behavior threatens the dignity and reputation of the legal profession. The public has a right to expect attorneys to provide competent representation, and conduct that falls short of these standards undermines the integrity of the legal profession. Pegram’s mental state is not an issue. Intent to harm is not an element of any of the violations found or alleged. Aggravating factors are Pegram’s substantial experience practicing law, multiple offenses involved in the case, and his refusal to acknowledge the wrongful nature of his misconduct. Mitigating factors include a lack of dishonest or selfish motive and an absence of prior discipline.
¶21. The cases in which we have found violations for failure to return unearned fees generally involve more egregious circumstances and violations than we find in the present case. See Goeldner v. Miss. Bar, 891 So.2d 130 (Miss.2004); Stewart v. Miss. Bar, 969 So.2d 6 (Miss.2007); Foote v. Miss. Bar Ass’n, 517 So.2d 561 (Miss.1987); Miss. Bar v. Pepper, 939 So.2d 767 (Miss.2006). Here, we affirm the Public Reprimand issued by the Complaint Tribunal. We additionally order that this matter be submitted to the Fee Dispute Resolution Committee of the Mis *237 sissippi Bar for a determination of the unearned fee.
CONCLUSION
¶22. Pegram was involved in many positive and well-meaning ways in Iroko’s life. But well-intentioned personal investment in a client does not automatically translate to fulfilling the responsibilities of a legal advocate. Pegram provided incompetent representation and failed to comply with the rules governing termination of representation. We affirm the judgment of the Complaint Tribunal and find an additional violation of Mississippi Rule of Professional Conduct 1.16. We order that the matter of whether Pegram should refund a portion of the fee as unearned be submitted to the Fee Dispute Resolution Committee of the Mississippi Bar.
¶ 23. THE ORDER OF THE COMPLAINT TRIBUNAL ISSUING A PUBLIC REPRIMAND IS AFFIRMED, THIS COURT FINDS AN ADDITIONAL VIOLATION OF MISSISSIPPI RULE OF PROFESSIONAL CONDUCT 1.16. THIS CASE IS REFERRED TO THE FEE DISPUTE RESOLUTION COMMITTEE OF THE MISSISSIPPI BAR FOR A DETERMINATION OF UNEARNED FEES.
WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., KITCHENS AND KING, JJ„ CONCUR. COLEMAN, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY LAMAR AND PIERCE, JJ.

. We clarify that withdrawal before completion of representation is permissible so long as the withdrawal is in compliance with Rule 1.16; we further note that at the outset of representation, "[a] lawyer may limit the objectives or scope of the representation if the limitation is reasonable under the circumstances and the client gives informed con *235 sent.” M.R.P.C. 1.2(c) (as amended in 2010). This ''unbundling of legal services” exception would not apply to the case at hand. When Pegram was substituted as counsel for Iroko post-indictment — and given that he had accepted a $20,000 fee for the entire case — he accepted both the financial and professional responsibility either to try the case himself or engage trial counsel for Iroko. Limiting his role at that stage would be unreasonable in the absence of adequate measures to compensate for the limited role, such as continuing the association of competent counsel.